Garland, J.
This case was before us in July, 1843, and remanded for a new trial. 5 Robinson, 354. The pleadings were then stated in full, and it is not necessary to repeat them in detail. The allegations are briefly these :
1st. That M. Gordon, Jun., being the cashier of the Bank, acknowledged that he was indebted to it in the sum of $51,500, for which he gave his four notes, in equal sums, endorsed by M. Gordon, Sen., and the plaintiff, payable at different periods.
2d. That the petitioner, being in no way connected with the business and private transactions of said M. Gordon, Jun., was induced to endorse the notes by the consideration professed by the Bank, that the indebtedness of said Gordon was honest and real, and that the notes would be fully guarantied by substituting in their place other notes, which were to proceed from the sale of the property of the drawer, to be sold in a short time.
3d. That he was further induced to endorse said notes, by the unequivocal and repeated assurances on the part of the Bank, that the said M. Gordon, Jun., would thereby be enabled to keep his office of cashier, which he then held, at a salary of $8000 per annum ; which was to be applied to the payment of said notes,-should it happen that the property to be sold should prove insufficient to cover them.
4th. That if it had not been for these considerations he would never have endorsed the notes.
5th. He further states that, at the time he endorsed the notes, it was within the knowledge of the directors of the Bank, that M. Gordon, Jun, could not effect the sales of property contemplated for any thing like the amount of the notes, and that they *285 knew full well the. inability of the drawer to pay them, and his absolute insolvency.
6th. That although the directors exerted themselves to represent the indebtedness of M. Gordon, dun., as originating in a moral and legal cause, yet they did so for the sole purpose of entrapping the good faith of the petitioner, while they prepared themselves to dismiss said Gordon as cashier, as soon as the security should be obtained.
7th. That by the wicked practices and frauds of said Bank, and their connivance with said M. Gordon, Jun., to screen him from what he considered a dangerous debt, and by the suggestions of the directors tending to impress the petitioner with the idea and belief that his said endorsements would be nominal, which were assumed to be covered by the proceeds of the sales which they knew could not be effected, and by the proffered assurances that Gordon should keep his office, and thereby be enabled to protect the endorsements given, they induced him to sign the same, and brought on him the necessity of paying them; whereby he has sustained damage as claimed.
The defence is fully stated in the former report of the case.
In consequence of the evidence introduced on the second trial, it becomes necessary to restate, at length, the evidence laid before the jury.
The board of directors chosen by the stockholders of the Bank, and appointed by the Governor and Senate, in the month of January, 1839, entered upon the performance of their duties on the second Monday of February, and elected C. Adams, Jun., president of the Bank, in place of Mr. Milligan. They found Martin Gordon, J un., in office as cashier, under a bond for $50,000, signed by the plaintiff and three other persons as hh sureties; the condition of which bond is, that said cashier “ shall render a faithful account of all moneys and effects committed to his charge, and well and truly perform the duties of said office, and all other official duties committed to his charge in said Bank.” They also found an application from the plaintiff, dated the 4th of February, 1839, for a loan of $35,000, to be secured by a mortgage on certain real estate. In this application, the plaintiff states that, without exaggeration, he owns property worth a million of *286 dollars, and that his floating debt in the banks, and elsewhere, does not amount to more than $85,000, notwithstanding which, he says, he is excessively harassed or cramped for money, (ex-cessivement gene,) and that as he could not procure in the other banks the sum he needs, he has thought, as he had been a patron of the institution in the legislature, and had friends who knew his affairs at the board, he would submit a proposition for a loan. He stated that Preval, one of the directors, knew his affairs as well as he did himself
It was the duty of the new president to examine the situation and affairs of the Bank; and, upon looking into the monthly accounts current from the branches, he found in the accounts from the branches at Natchitoches and St. Martinsville, that the mother bank was not credited with certain sums with which they were charged on her books. He inquired of the book-keeper how that happened, who replied, that he had noticed the difference, and said he had informed Gordon, that there was no acknowledgment of the receipt of those sums by the branches. Adams then spoke to Gordon, who seemed astonished that those letters had not been received. The president then considered it his duty to bring the matter before the board of directors. See Frey’s testimony, plaintiff’s letter, and Gordon’s bond. Preval said, that the board of directors appointed a committee to inquire into the causes of the deficit, of which committee he was a member, Adams and Milligan being the other members. At what precise date the president made his communication to the directors, is not shown by any witness or document. It must, therefore, be inferred from circumstances. Preval says, that “ the causes of the deficit could not be discovered ; but that the committee thought there was, at least, great negligence on the part of Gordon, the cashier, which negligence consisted principally in this, that a considerable time had elapsed between the time at which he said he had sent the money to the cashiers of the branches, and the time at which he informed the board that he had received no news of the reception of the funds. The committee was of opinion that the negligence was such, that the said Gordon was obliged to refund the sum which was then wanting, and notified their intention to Gordon, the cashier, who subscribed to it, and *287 in consequence thereof, made propositions to settle the said deficit. The propositions were, to furnish a mortgage on certain property, of which he gave a memorandum to the committee, who refused to accept the same, on account of the pre-existing mortgages against him, and the tacit mortgage of his wife, who was then a minor; the said property not being by them considered as sufficient security. It was then that Gordon offered to furnish his notes, endorsed by his father and Bernard Marigny, with the condition that Gordon, the cashier, after furnishing such notes, would sell his property at such terms as to meet, by fifteen days before maturity, his notes to the Bank, by those given in payment of the property sold, in substitution of those by him furnished, endorsed by his father and B. Marigny; with the condition however, that the notes given in substitution, should also be endorsed by Marigny.” The committee made their report on this basis, and it was adopted by the board. Another reason why the committee refused to receive the offer of the mortgage security from Gordon, Jun., was, that he was largely indebted to the Bank, in a sum of twenty-five or thirty thousand dollars, as appears in another place.
Prom the testimony of Hiriart, given on both trials, (and here it may not be amiss to remark, that all the evidence taken on the first trial was read in the second,) it appears that, about the last of February, or the first of March, 1839, he was informed by the plaintiff of the loss of a certain sum of money, said to have been sent by Gordon, the cashier, through the post office. The witness says, he had some doubts whether it had been lost in that way; and when Marigny told him, at the theatre, about the deficit, and how the money had been put in the post office, he laughed at it, and told him that he did not believe a word of it. “ The first time Marigny spoke to witness about this matter, he told him (witness) that he was requested by Gordon, Sen., to endorse Gordon, Jun.’s, obligations to the Bank, to cover a loss of $50,000, in bank notes, which said Gordon, Jun., had put in the post office. Mr. Marigny was then ih the firm belief that the money had been really lost, and witness was not of that opinion, and was still less, when he understood from Chinn that the notes were of five and ten dollars.” A few days after this conversa *288 tion, early in March, the witness met with T. W. Chinn, one of the directors' of the Bank, and having an opportunity to converse with him on the subject, “ he asked him if the Bank had the intention of keeping said Gordon as cashier. Mr. Chinn answered, probably not; but that it had been necessary to postpone such a matter for the interest of the Bank. The witness then told Chinn, that no director appointed by the State could entertain a hope of being confirmed by the Senate in a future nomination, if they were to keep Gordon as cashier. ■ Chinn said he would be removed. Witness then asked him if Marigny had not given security, and engaged his property for Gordon. Chinn answered, that thing was to be done, but that he did not know whether it was then done ; but that Gordon would soon be removed from office, because the business will be settled.” He then asked Chinn if his opinion was, that Gordon had really lost the money by sending it to the cashiers of the branches, adding that, as to himself, he did not believe it; and Chinn said he did not believe it. He then proceeded to say, he took great interest in young Gordon, as his father had been of great service to him on his arrival in the State ; and proceeded to relate a conversation he had held with the cashier, on the piazza of the Bank, the purport of which, as gathered from the statement in both trials, is, that Chinn requested Gordon to tell him how it happened that he had gone to the post office to put. so large a sum in it without taking a receipt; and further asked him, if he did not know, that so large a sum of money, in five and ten dollar notes, would make a bundle as large as, his hat. Young Gordon, did not answer. Chinn then asked him, if he had not received within a few days, a sum of about $30,000, from his father-in-law, and what he had done with that sum. Gordon said he had not received it. Chinn replied, I have been told so by Mr. Field, and as he is now passing, I will ask him. He did so, and Field replied : “ I have said nothing more than the truth whereupon Gordon exclaimed, “ Oh, Mr. Field, you injure me ; you ruin me and my character.” He passed on, and Chinn then said : “ Ah, Martin, I think it is still worse than I thought beforemeaning, as he says, Chinn told him, that the deficit exceeded $50,000, and that Gordon had put the sum of $30,000, among the cash in the Bank, to cover a larger deficit. *289 That hé could not believe the money had been lost, as he stated, and he must have taken it to pay his debts, or those of his father. The witness further says, that one or two days after his conversation with Chinn, he met Adams, the president of the Bank, and asked him, if he intended to keep Gordon, Jun., as cashier; adding, that he was a senator, and would not vote to confirm any state director, who would consent to keep him in office. Adams replied, that he would not be kept long, and would be removed, but it was not time yet to turn him out. On the second trial, the witness said, that when he asked Chinn if the board intended to keep Gordon as cashier, the answer was, that they were about to settle with Gordon, Sen., and Marigny that business, and that they would not turn young Gordon out before the settlement was accomplished.
We come now to a part of the testimony of this witness given on the first trial, which it is somewhat difficult to reconcile with his statements on the second. At page 22 of the record, he says, “ that his conversation with Marigny, alluded to in his former testimony, took place about the latter end of February, 1839, or beginning (say 1st or 2d) of March. Spoke to Marigny, of his (witness’) conversation with Chinn, in the month of April or latter part of March; he thinks during that conversation, Marigny told him he had endorsed the notes, and witness said that he was wrong, and told him of his conversation with Chinn.” At the second trial, Hiriart said : “ Mr. Marigny told witness at the theatre about the deficit, and how the money had been put in the post office ; witness laughed, and told him he did not believe a word of that.”
“When witness came down after his conversation with Chinn, witness had also some conversation with Marigny; thinks at that time Marigny had already given his endorsement; witness went on, and told him what he thought of the loss of the money; about fourteen months after that, Marigny took witness by the arm, and asked him what conversation witness had with T. W. Chinn and C. Adams, Jun? Witness then told him what were his impressions, and what was the conversation he had with Chinn and Adams some months previously. It appears at that time, Marigny was about suing the Union Bank, and told witness, that he called *290 some time before on Frey the cashier, for a copy of the proceedings of the Bank concerning the affair. He is convinced, that when that conversation took place, Marigny had paid the notes that he had endorsed to pay the deficit above mentioned. Witness wishes to amend his former declaration, in stating that when he informed Marigny of the conversations he had had wilh Chinn and Adams, Marigny had already paid the notes that he had endorsed for Gordon. After his conversation with Chinn he saw Marigny, but did not give then the above details; it was only fourteen months after that he did so.”
Preval was one of the directors of the Bank, an intimate friend of the plaintiff, and one of the committee to examine into the deficit. We have previously stated, what he said the action of the committee was. Pie is the person who, the plaintiff says in his letter, knew his affairs as well as he did himself. He testifies that the personal and business relations of the plaintiff and M. Gordon, Sen., were of the most intimate kind. The friendship between them, was one of the reasons that induced the plaintiff to endorse the notes of Gordon, Jun. “ Marigny told witness, that his situation towards Gordon, Sen., was such that he could not refuse him anything. It is not to witness’ knowledge, that the Bank employed any fraudulent means to engage Marigny to endorse the notes.” He further says that, on the 18th of March, 1839, the day oh which the notes were dated, being about to go to the meeting of the board of directors, he sent a message to the plaintiff, requesting him to come to see him. He came about nine o’clock, A. M. The witness told him, he had sent for him to inform him of a serious occurrence in the Union Bank. That there was a deficit or loss, and the information had been given to the board by Gordon the cashier, informing them officially, that he had sent the money through the post office, to two of the branches, and that he had not as yet received any information of its receipt. He told him a committee had been appointed to investigate the affair, and that the result had been, that Gordon had bound himself to reimburse the sum by notes at 12, 15, 18, 24 months, to the order of his father, and endorsed by him, Ma-rigny. He told plaintiff, that he had sent for him to inform him of the facts. The plaintiff replied, “what shall I do in such a *291 case?” The witness said, he supposed, in consequence of the relations of friendship between him and Gordon, Sen., he would find it difficult to refuse his endorsement. Plaintiff was silent a time, but as the witness was about to leave, be asked if witness thought there was any danger in his endorsing for that amount, and witness replied he supposed not, and went away. The witness went to a meeting of the board, and whilst it was in session, or shortly after its adjournment, the plaintiff came in. He had in his hands the notes of Gordon, Jun., endorsed by Gordon, Ben. He called Milligan aside, and had a conversation of some minutes with him. Milligan showed him the report of the committee, and the plaintiff endorsed the notes on the table in the directors’ room, without conversing with any other director. The witness did not conceal from plaintiff anything he knew on the subject, or his opinions of the matter.
This witness on the first trial said : “ When the board was trying to come to a settlement of the deficit with Martin Gordon, Jun., the said Gordon was made to understand, that if the settlement was made, he would be permitted to keep his office of cashier. After the transaction was completed, the witness heard from some of the directors, principally from Milligan, that they would intimate to Gordon that he must resign.” Milli-gan said he had told him to resign. On the second trial the statement is: “ It was understood at the time the arrangement took place, that Gordon should retain his office as cashier.” And he “resigned his office, because some of the directors gave him to understand that he ought to resign. Says that among the directors it was suggested that it would be well for him to send in his resignation. From all the circumstances, does not believe that the resignation was a voluntary one.”
Bermudez says, he was a director of the Bank, and was present when the endorsement of the plaintiff on Gordon’s notes was first spoken of. He does not recollect when information was required about the value of the property. The information he had, as to the deficit and proposals made; were from the committee. He observed, at the board, that as Marigny would perhaps have some objections to give his endorsement for such a sum of money, if he knew the facts and circumstances of the deficit, he *292 ought to be informed of them all. Some members of the board of directors were invited to see Gordon, Jun., and invite him to resign. His resignation may be termed a voluntary one — he would call it so ; but if he had not resigned, he would have been removed. The witness spoke of the affair to plaintiff after the notes were given, and he questioned witness as to some facts. He did not disclose all his opinions and. views in regard to the; deficit. He had another conversation with plaintiff after public opinion had been expressed on the subject of the deficit, and he reproached witness on the subject, saying he should have been informed of all the circumstances ; when witness replied, it was not his duty to inform him of all that, and he thought Preval had done so ; and he had done at the board, all he could to have him informed of the deficit, before the endorsement of the notes.
Frey was a director of the Bank, at the time the deficit was discovered, and the notes given by Gordon and endorsed by plaintiff. “ There was no manoeuvre on the part of the Bank, to obtain the endorsement. It was Gordon, Jun., who offered the endorsement of plaintiff, who knew, as well as witness did, what were the circumstances, because, before signing, Marigny inquired of witness about it, and he told him all he knew. Witness knows further, that another director of the Bank, advised Ma-rigny not to endorse the notes. It was James Freret. During that conversation between witness and Marigny, this last one told him, that he had nothing to refuse to M. Gordon, Sen.” He cannot state the precise time of this conversation, but it was certainly before the settlement with M. Gordon, Jun., was completed. “ It was publicly known that the deficit existed, and that it was said by Gordon, that the bundle of notes had been lost through the post office. It is not to witness’ knowledge, that there was any express or tacit agreement between Gordon and the board, that he could retain his office after the settlement proposed. Ma-rigny asked witness if Gordon was to remain as cashier, and witness answered, that he saw nothing to the contrary. He was astonished when Gordon first told him that he was to resign, for witness had never spoken of it with any director of the Bank.”
On the 18th March, 1839, the plaintiff endorsed the notes, aud an that day, a resolution was entered on the minute book of the *293 board of directors, appointing a committee to confer with the cashier on the subject of the remittance to the branches, and to report on the causes which may have occasioned a deficit of $51,500. The report of that committee, is entered' on the minutes the 19th of March; but it is evident, that the committee existed before the date when it appears to have been appointed, and that the report made to the board of directors was prepared before the date at which it purports to have been presented.
The report states, that on the 5th of March the cashier said to the directors that, on the 15th November previous, he had sent $15,000 to the branch at St. Martinsville, and on the 17th of December, he had sent $8,000 to the same branch, and $38,500 to the branch at Natchitoches, of the receipt of which sums, he had received no information, except a letter from the cashier at St. Martinsville, acknowledging the receipt of a package of $10,000 on the 7th of January, 1839. The committee say, that the cashier perseveres in his statement of having remitted the sums stated, about the dates mentioned, through the post office; and accounts •for the sum of $10,000 being received at St. Martinsville instead of $8000, by supposing he may have put $2000 less in one of the other packages. He said he had put the packages in the post office in person; that he had no particular instructions as to the manner of sending money to the branches, except verbally, which were to send the notes by some trustworthy persons, or by the post office when the river communication was obstructed. That no news had been received of any accident or obstruction having occurred, in the transportation of the mail to the places mentioned. These circumstances, the report says, the cashier thought would have the effect of injuring his character, and casting some doubts upon his integrity, wherefore he had offered to pay the amount of the loss, by giving his notes, endorsed by his father and plaintiff, payable in equal instalments, at 12, 15, 18 and 24 months, binding himself to dispose of sufficient property to meet the sum stated, upon such terms as to meet, fifteen days previous to maturity, the notes to be given. The notes received from the sale of •the property to be endorsed by M. Gordon, Sen., and plaintiff, and to be substitued in place of the others. The committee say, they will not express any positive opinion upon the causes of the loss *294 of the money;, but recommend the adoption of the proposition offered by the cashier, and that authority be given to the president^ to pass the necessary acts to guaranty the fulfilment of the proposal.
On the 21st Mareh, M. Gordon, Jun., addressed a letter to the board of directors, stating that he had been informed it was their intention to remove him from office, on account of the loss of $51,500, which he had forwarded to the different branches, and desiring to know if such was the intention of the direction. In reply to this, a resolution was passed, directing the president to inform him “that no decision of that kind had been made, nor any motion to that effect been presented to the board.”
On the 9th of April, a letter from Gordon, Jun. was laid before the board, in which he stated that he resigned his office, to take effect on the 1st of May following, whereupon, the following preamble and resolution were adopted. “ Whereas an incident has occurred in the Union Bank of Louisiana, in the transmission of $51,500, from this bank to two of its branches, by the cashier of this bank, and which sum has been lost or not come to hand, and, whereas the said transaction might be construed to the prejudice of the integrity of said cashier,
“ Be it, therefore, resolved unanimously, that the confidence of this board is unimpared in the honor and integrity of Martin Gordon, Jun., cashier aforesaid, and that they fully acquit him of all suspicion arising out of this transaction, calculated to attach suspicion to his integrity.”
Bermudez says he was present at the board when the resolution was passed. There being no satisfactory proof that Gordon had stolen the money, they were bound to presume he was innocent. The resolution was called for by M. Gordon, who said his character would be injured by his leaving the bank, and that many would say he had taken the money, if such a resolution was not passed. Preval said, as a member of the committee, he was of opinion that Gordon had been very negligent, but he was not able to come to the conclusion that he had embezzled the funds of the Bank, and subjected himself to a criminal proceeding. Frey says, that Gordon was very negligent in forwarding the money in that way, but he had no reason to disbelieve his state *295 ment. His opinion was, and the opinion of the board, as far as he knew it, was, that the thing had taken place, as Gordon stated it. He thought it extraordinary, but nothing could make him believe that Gordon had stolen the money; he had too much esteem for him to form sitch an opinion, without proof. What motives the other directors had in voting for the resolution, are not stated.
In the course of the month of April, 1839, plaintiff, in his application to the bank for a loan, obtained one for #20,000 on mortgage security.
On the 1st of May, Gordon left the Bank; and, a few days after, plaintiff left for France, from whence he did not return until the month of December following. Gordon, on the 13th of May, had the preamble and resolution published in a newspaper. On the 28th of June, he went before a notary, and, recognizing the promise he had made to furnish an indemnity to secure the payment of the notes, and especially “ to protéct the said Bernard Marigny, and save him harmless from the effect of his endorsement on said notes,” he gave a mortgage on a great deal of property, but upon which there were some previous liens.
About the 21st March, 1840, one of the four notes fell due, and, not being paid, was protested. On the 12th of March, 1840, before any of the notes were due, the plaintiff addressed a letter to the Bank, saying that he was very desirous of extricating himself from the difficulties thrown upon him by his endorsement of the notes of Gordon, Jun., and, not doubting the liberality of the board, he hoped it would be extended to him in his then situation ; he, therefore, offered to pay the four notes of Gordon, and his own note of $20,000, in the bonds of the New Orleans Thea-tre Company. He says, if the amount of the bonds of which he can dispose,- leaves a surplus over the endorsements and his note, he has no objection to its being applied towards his endorsement of a note of Martin Gordon, Sen., for about $9000. This proposal was finally accepted, the Bank agreeing to take the bonds at a discount of twenty per cent. The arrangement was completed on the 29th April, 1840, when the plaintiff took up all the notes of Martin Gordon, Jun., also the note of Martin Gordon, Sen., and instead of paying his own debt of $20,000, he paid one *296 year’s interest, and it stood over. The Bank gave him the notes•, and by a notarial act of the same day, transferred to him the mortgage given it by M. Gordon, Jun., with a full subrogation of all rights and privileges against him. With these notes, the plaintiff, on the same day, went to the Citizens Bank, and by pledging them, as security, he got his note or notes endorsed by John Davis, discounted, to the amount of $26,000.
M. Gordon, Jun., made a cession of his property on the — day of-; the plaintiff attended a meeting of his creditors, as one of them, with the notes he had taken up, and actually received from the syndic upwards of $11,000 on the mortgage. At the time of all these transactions, it was known to the plaintiff, and publicly known, that M. Gordon, Jun., had left the Bank since the 1st of May previously, and was no longer its cashier.
Upon this testimony, the jury a second time found a verdict for the plaintiff, for upwards of $53,000, and the defendants have appealed.
We are of opinion that the evidence establishes :
1. That there was a deficit in the cash belonging to the Bank, and that the committee was of opinion it was caused by the negligence of Gordon, the cashier. It was so gross as to induce the committee to notify him of it, and of tire opinion that he was liable to refund the money; to which he assented, for that and other reasons as stated in the report shown to plaintiff, and in Preval’s testimony.
2. That the plaintiff was one of four joint and several sureties , on the cashier’s bond, and if M. Gordon, Jun., was liable on
it, plaintiff was also liable for $50,000, subject to his recourse on his co-sureties.
3. That at the time of the discovery of this deficit, the plaintiff was much cramped in his pecuniary affairs, and harrassed for money, and was solicitous to obtain a loan of $35,000, representing himself as a very rich man ; and he knew that loan could not be. obtained, if a suit was commenced on the cashier’s bond.
4. That the personal and business relations of plaintiff and M. Gordon, Sen., were very intimate, and, to use the expression of the former, he could not refuse the latter anything. Preval says, the friendship of plaintiff to Gordon, Sen., was one of the *297 reasons that induced him to endorse the notes of Gordon, Jun. Plaintiff was the endorser of Gordon, Sen., to the amount of $40,000, and the latter his endorser to the amount of $48,000. Gordon, Jun., owed the Union Bank upwards of $25,000, for which Gordon, Sen., was his endorser.
5. That the plaintiff in the latter part of February, or the early part of March, 1839, was informed of there being a deficiency in the funds of the Bank, and had, previously to his first conversation with Hiriart, been applied to by Martin Gordon, Sen., to endorse the notes of Gordon, Jun., to be given the Bank to cover a loss of about $50,000. He told Hiriart of it at the theatre, and, although he may have believed Gordon, Jun., was not culpable, and the money was lost from the post office, yet he knew Hiriart did not believe it.
6. That the committee of examination was appointed at an earlier day than the 18th of March, when the resolution ordering it was entered on the minute book or journal; and that the committee had performed their task, and that they put their report in writing, that day, or a short time previously.
7. That the proposition -of Gordon, Jun., to give his notes endorsed by Gordon, Sen., and plaintiff, was made 'and accepted several days before the notes were executed ; and that there was an understanding, that young Gordon was to sell his property on such terms as to anticipate, by fifteen days, the maturity of his own notes, which were to be given up as soon as others were substituted in their place. But we see no evidence that the Bank guarantied to the plaintiff the performance of this stipulation.
8. That the testimony of Preval and Frey proves, that they communicated to the plaintiff all the circumstances relative to the deficit, which they, as directors, knew; and that the former told him of the proposition of Gordon, Jun., to give notes endorsed by him ; and that Freret also warned him not to endorse the notes. No other directors of the Bank conversed with the plaintiff previous to his endorsing the notes, than Preval, Frey, Freret, and Milligan. The latter is dead, and Freret was not called as a witness by either party. The conversations with Bermudez were subsequent. The plaintiff asked Frey, if Gordon, Jun., was to be retained, and he replied that he knew of nothing to the contrary; *298 and it is probable that Preval told him that it was understood he would be retained, although he does not say so in terms. He says, he gave him all the information he possessed, or words to that effect, and we think such was his impression when he endorsed the notes, although no positive agreement to that effect is proved, as between the plaintiff and defendants ; nor was it an absolute condition in the contract.
9. That the testimony of Hiriart satisfies us, that early in March, 1839, he had a conversation with T. W. Chinn, one of the directors, and that he told him it was very probable Gordon, Jun., would be removed from office; but that it was not then the time to do it, and that an arrangement was pending which made it necessary to retain him. We believe, also, that Hiriart spoke with Adams on the subject, and that the latter used such observations as induced the witness to believe, that Gordon was to be removed, and that he was only retained until the interest of the Bank was secured. It is probable, that Chinn and Adams used the language the witness attributes to them ; and we further believe, that he informed the plaintiff of both conversations in the latter part of March, or early in April, 1839. In his testimony on the first trial, he says so, positively ; on the second trial, he says, he did have a conversation with plaintiff on the subject, about the time mentioned, but he did not give all the details until about fourteen months after his first conversation. We believe, that this witness held at least three conversations with the plaintiff, to wit, one about the last of February, or the 1st of March, 1839j which induced him to speak to Chinn and Adams ; another about the last of March, or first of April in the same year; and a third about the month of May, 1840. Our belief, that in the second conversation, the witness told plaintiff of his conversations with Chinn and Adams, is confirmed by the manner he says the third conversation commenced. He says, that Marigny took him by the arm and asked him, what conversation he had had with T. W. Chinn and C. Adams, Jun. He then told him, &c. If the witness had not previously told plaintiff of these conversations, it is not explained in what manner he came to the knowledge of their having been held. If our impressions and belief be not correct, then the difference in the statements of the witness on the *299 two trials is so palpable, as to deprive his testimony of much of its weight.
10. That the plaintiff went himself to the Bank with the notes of Gordon, Jun., endorsed by Gordon, Sen., a short time after his conversation with Preval. That he had a private conversation with Milligan, one of the directors, who showed him the report of the committee. What Milligan told him is not in evidence. It is not proved that he had any conversation with any other person in the Bank. The board of directors was in session, or had at the moment adjourned, and a number of them were there. No questions were put to the president, no explanations asked from any one but Milligan, and no pledge required or given, that Gordon, Jun., should not be removed until the notes were paid. No person asked the plaintiff to go to the directors’ room ; and whilst there, no one desired him to endorse the notes, or used any means to induce him to do it. His most intimate friend was present, and no counsel was asked of him, nor was any control assumed or attempted. He endorsed the notes of his own free will and accord.
11. That a few days after the nofes were endorsed, Gordon, Jun., informed the directors, that he had heard from a person not connected with the Bank, that he was to be removed, and he desired to know if that was the determination of the board. They reply, that no such motion had been presented, and no decision of the kind made. There was, no doubt, a strong desire on the part of various members of the board, that the cashier should resign ; it was spoken of among themselves, and suggestions made, that the propriety of his doing so should be intimated to him. But no one is said to have given such an intimation, except Milligan, who is dead. In the letter which Gordon writes to the board of directors, he does not intimate that any promise, direct or indirect, was made, that, if he gave his notes for the deficit, he should remain in office. He speaks of “ having promptly settled, without being required, the great loss sustained in the transmission of notes to the branches, to the satisfaction of the direction and lie hopes, under existing circumstances, that such a course will not be thought of by any director, as it would be a direct censuro and impeachment of his integrity.
*300 12. That on the 9th of April the resignation of Gordon was received, to take effect on the 1st of the ensuing month. It is very brief, merely tendering his resignation, and expressing his solicitude for the health and prosperity of the members of the direction. There is no complaint, or intimation of compulsion, or breach of any express or implied engagement. Preval says, that he does not consider the resignation a voluntary one. Ber-mudez says, he calls it voluntary ; but if he had not given it, he would have been removed. Frey says, he was astonished when Gordon told him that he intended to resign. The resignation we must regard as Gordon’s voluntary act, as there is no evidence of its being extorted by any violence, menaces, or threats; but we have no doubt that it was caused by his discovering that there was a want of confidence in him, exhibited by the board of directors, or by some of them. Gordon, Jun., was not called on as a witness to state his motives, or the causes of his resignation. We have no doubt, that the plaintiff was informed of the resignation before his departure for France. The fact was publicly known, and from the intimacy of the plaintiff with the Gordons, we cannot believe that he was ignorant of the resignation of the youngest, as cashier. As soon as this resignation was accepted, the board of directors passed the resolution acquiting Gordon of all suspicion attached to his integrity. This was done at the request of Gordon, Jun. Three of the directors, to wit, Preval, Bermudez, and Frey, inform us of their motives in voting for it, which, in effect, are, that there was not sufficient evidence to justify them in saying that Gordon, jun., had embezzled the money or stolen it, so that a criminal prosecution could be maintained against him. They were bound to hold him innocent until he was proved guilty. Whether the other directors were influenced by similar motives or not, the record does not inform us.
13. That some time after the plaintiff endorsed the notes, and Gordon had resigned, to wit, on the 22d April, 1839, he obtained a loan of $20,000 from the Bank, to secure the payment of which in one year, he gave a mortgage on several tracts of land and a number of slaves, “ without claiming the right of renewal,” and further gave his note with M. Gordon, Sen., and Pierre Soulé, as endorsers for said sum, to bear ten percent interest, per annum, *301 from maturity, in case of non-payment, which loan feil due in April, 1840, about one month after the first notes of Gordon, Jun., had matured. Within fifteen days after this loan was made, the plaintiff departed for France, and did not return until the month of December.
14. That M. Gordon, Jun., in the month of June, 1839, gave a mortgage on a large quantity of property, to secure the payment of the notes he had given; thereby a second time admitting, his being indebted to the Union Bank. In this act he says, that he gives it to secure the Bank, and to protect the plaintiff from loss in consequence of his endorsements. The benefit of this act the plaintiff afterwards availed himself of, by claiming a mortgage on Gordon’s property.
15. That it is proved that, about the time the first of Gordon’s notes was becoming due, the plaintiff made proposals to the Bank to discharge it, and the three others not due, also his own debt, and a note of Gordon’s, Sen., amounting altogether to more than $80,000, with the bonds of the New Orleans The-atre Company. That the proposal was accepted, and bonds were taken in payment of the notes of the two Gordons, and one year’s interest on the plaintiff’s own debt for $20,000, for which a delay of a year was given, although expressly stipulated not to be renewable. No part of the principal was exacted, and, in 1841, we find the Bank renewing the debt for both principal and interest, or making a new loan of that sum. The plaintiff, in a letter addressed to the Bank a few weeks after this settlement, speaks of the negotiation of the bonds as arising in a great degree from a wish to obliga Davis, the holder of them. The position of his owu affairs he shys is brilliant, and he asks a further discount of $12,000.
16. That as soon as the plaintiff had taken up the notes of Gordon, Jun., and 'got a transfer and subrogation of the mortgage given to secure them from the defendants, he, on the same day, pledged them to the Citizen’s Bank, to secure a loan of $26,000, to him by that institution. He subsequently appeared in a meeting of Gordon’s creditors, and voted as a creditor, and finally received upwards of $11,000, from the syndic named by *302 those creditors ; and in all other respects he has used those notes, and the mortgage as his own.
The law relied upon by the plaintiff’s counsel is very plain. It is, that an obligation without a cause, or with a false or unlawful cause, can have no effect. The cause is illicit, when it is forbidden by law, is contrary to moral conduct, or to public order, and the cause of contract is the consideration or motive for making it. Civ. Code, arts. 1887, 1889, 1890. Pothier on Obligations, Nos. 42, 43. Also, he who receives what is not due to him, whether he receives it through error, or knowingly, obliges himself to restore it to him from whom he has unduly received it. He who was paid through mistake, believing himself a debtor, may reclaim what he has paid ; but to acquire this right it is necessary that the thing paid be not due in any manner, either civilly or naturally. A natural obligation to pay will be sufficient to prevent the recovery. Civ. Code, arts. 2279, 2280, 2281. A thing not due, is that which it paid on the supposition of an obligation which did not exist, or from which a person has been released. Civ. Code, art. 2282. The payment from which a party might have been relieved by an exception that would extinguish the debt, affords ground for claiming restitution ; but the exception must be such, that it will extinguish even the natural obligation. Civ. Code, arts. 2284, 2285.
Let us see the application of the facts to these principles. M. Gordon, Jun., was the cashier of the Bank, under an obligation faithfully to keep and render an account of every thing committed to his charge, and the plaintiff is surety for his good faith, diligence and honesty. A heavy loss is ascertained to have been suffered; a committee is appointed to ascertain the causes, and they are of opinion, that the loss was occasioned by the negligence of Gordon, Jun.; they tell him so, and he agrees to refund the amount, because he thought the circumstances may have the effect of injuring his character and casting doubts upon his integrity. If the loss was occasioned by the negligence of Gordon, Jun., was there not a natural obligation resting on him to make it good? We think so ; and it would probably not be difficult to prove, that there was a legal one also. At any rate, there is nothing unlawful, or illicit in it. Such a promise does *303 not appear to us to be against good morals, or public order. The negligence of an agent may cause his principal as much damage as his unfaithfulness ; and the natural obligation to repair such damage or injury, is as strong in one case as in the other. Gordon, Jun., to save his reputation from suspicion, agrees to pay a sum of money that has never been seen or heard of, since it went into his hands. He says, that he sent it to particular places; but there is no evidence that the money ever was sent, other than his own statement; and it is certain, that it never was received by those to whom it is said, it was sent. Under such circumstances there might be doubts and suspicions, and it was his purpose to remove them by paying the money.
Admitting that Gordon’s statement be true, that he put the money in the post office, his negligence in the matter was inexcusable. He retained no description of the notes remitted, that in case of loss from the mail they might be advertised. One remittance was alleged to have been made on the 15th November, and two others on the 17th December, 1838 ; and of the first, and of one of the second, no acknowledgment is made, late in February, 1839 ; his attention had'been called to it by the bookkeeper, but no inquiries were made, or attempts to recover the money set on foot, nor any disclosure made to the directors, until the circumstance was known to the president. He then was authorized to go to St. Martinsville and Natchitoches, to investigate the matter, but never went. If he did, the record does not so inform us. But suppose his statement not to be true, and that he embezzled the money, the situation of the plaintiff is still worse, for he would then be liable as a surety on the cashier’s bond.
The first allegation in the plaintiff’s petition is, that Gordon, Jun., acknowledged that he was indebted to the Bank $51,500 ; and the second is, that he (plaintiff) was induced to endorse the notes, because he was induced by the Bank to believe the indebtedness was honest and real. Was it not real ? The acknowledgment of a debt presupposes a consideration, and he who seeks to avoid the promise must show the want of it. We have carefully and deliberately examined the evidence in this case, and are satisfied, that there was a sufficient cause, and a just one too, to support the acknowledgment and promise made by Gordon, Jun.. *304 That being settled, it is sufficient to bind the plaintiff. Suppose Gordon, Jun., to have been sued on one of these notes; what exception or defence could he have set up, that would hate extinguished the civil and natural obligation on him to pay ? We can see none.
The plaintiff says, that he was in no way connected with the business and private transactions of Gordon, Jun. If the duties and obligations which the cashier of a bank is Under, to the institution that employs him, be no part of his private business and transactions, it may be true, that the plaintiff had no such connection. The relations of the cashier of a bank towards the institution that employs him, are those of agent and principal. We are not aware that the cashier of a bank is a public officer ; and it appears to us, that a person standing in the relation of his surely for $50,000, is rather closely connected with his transactions and affairs.
The allegation, that the Union Bank guarantied that Gordon, Jun., should sell his property for an amount equal to the four notes endorsed by the plaintiff, and that the notes obtained by such sale should be substituted in the place of the four notes, is not, in our opinion, sustained. That Gordon, Jun., made such a promise, and that the plaintiff was informed of it, is certain; but there is no proof that there was such a guaranty on the part of the Bank; and, if there'had been, the plaintiff well knew, when he took up the notes, in April, 1840, that Gordon, Jun., had not complied with his promise; and, as he took the notes and mortgage with a subrogation of all the rights of the Bank against him, we consider it a waiver of the guaranty alleged.
The third allegation is, that the Bank repeatedly and unequivocally assured the plaintiff, if he endorsed the notes, that Gordon, Jun., should keep his place of cashier, and that his salary of $8000,per annum, should be applied to tbe payment of them, if it should happen that the property to be sold should be insufficient to cover them. There is no evidence to sustain the latter part of this allegation. Not a single witness testifies to any agreement or understanding, that the salary of the cashier was to be retained by the Bank, and applied to the payment of the notes. The witnesses state how much the salary was, but none of them *305 say that it was to be applied as alleged. As to the allegation, that there were repeated and unequivocal promises that Gordon, Jun., should be retained as cashier if the notes were executed, we are constrained to say, that the evidence leaves it doubtful. Preval is the only witness who testifies with any directness, and his statement is not very particular. He says that, “ when the board was trying to come to a settlement of the deficit with Martin Gordon, Jun., the said Gordon was made to understand, that if the settlement was made, he would be permitted to keep his office of cashier.” On the second trial he said, “ it was understood, at the time the arrangement took place, that Gordon should retain his office of cashier.” In what way Gordon was made to understand he would retain his office, or by whom, is not stated. No resolution of the board to that effect is produced. No director is named who told him so. In the letter Gordon wrote to the board, three days after the notes were signed, stating that he had heard he was about being removed, he does not allude to any such promise or understanding, either direct or tacit. He says in his letter, that he understands the cause of his removal was the very sum for which he had given the notes endorsed by plaintiff; and it would be strange indeed, if such an agreement or understanding did exist, and not the slightest allusion be made to it. Frey says, that the plaintiff asked him if Gordon, Jun., would be retained as cashier, and that he replied, that he “ saw nothing to the contrary;” but he further says, that “it is not to witness’ knowledge, that there was any express or tacit agreement between Gordon and the board, that Gordon should retain his office after the settlement.” Bermudez was a director, and he no where testifies to any such agreement or understanding. It is very probable that Preval believed that Gordon would be retained in office, and that he so told the plaintiff; but met, as his unsupported vague statement is, by a .disclaimer of .any knowledge of the kind by another director, the silence of a third, and the fact that Gordon himself never pretended that there was such a promise, we are compelled to say, that the proof is such as to leave the matter doubtful, and that the plaintiff, holding the affirmative of the issue, must sustain his allegations by sufficient testimony. The plaintiff says, that such was the special agreement; and yet *306 he never raised an objection as to its being violated, until after he had paid the notes, although he knew that Gordon was not in office, and had not been for many months.
The next allegation is, that at the time the plaintiff endorsed the notes, the directors knew, (hat Gordon, Jun., could not make the . sales of property he" contemplated, for anything like the amount of the notes, and that they also knew, that Gordon was insolvent and unable to pay. The evidence in the case does not satisfy us, that the directors of the Bank knew, that Gordon could not make the sales of property he contemplated. The only evidence is, that when he offered a mortgage on his property as a security for the sum of $51,500, proposed to be paid them, they declined taking it, and thereby releasing the plaintiff, and the other securities, from the responsibility supposed to be resting on them. We have said, that there was no contract by which the Bank guarantied that the property should be sold by Gordon, Jun., at all, or for any fixed sum ; it is, therefore, immaterial whether he could sell or not. Nor is there any evidence as to the solvency or insolvency of Gordon at the time: that he became so after-wards is true. But, admitting that Gordon, Jun., was insolvent, aud so to the knowledge of the directors, we are not informed of any law that forbids them from endeavoring to secure a debt he might owe the Bank, or that required them, when an endorser or security was tendered, to say -to such endorser: you must understand, that we know the principal in this obligation is unable to pay it. Such a doctrine, it appears to us, would be entirely reversing the true position of creditor and surety, and make the former the warrantor of the debtor’s ability to pay, instead of th e latter. But, in the present case it happens, that the plaintiff did have some warning, for Frey tells us, that Freret told the plaintiff not to endorse the notes; yet he did so.
As to the sixth allegation of the petition, it appears to us, that the directors of the Bank did not, in representing the indebtedness of Gordon as real and arising from a legal cause, do more than the facts authorized them to do. Gordon acknowledged that the Bank had sustained a heavy loss; the committee of directors told him, that it was the result of his negligence, and that he was liable for it; he agreed to it, as Preval, the plaintiff’s witness, tells *307 us. As to the part of the allegation which charges the board of directors with preparing themselves for the dismissal of their cashier, as soon as the security should be obtained, there is not such evidence as satisfies us of the fact. That Chinn and Adams were of opinion that Gordon, Jun., would be removed, we readily believe. Hiriart tells us, that they told him so. Milligan, no doubt, also wished him to resign ; but it must be remembered, that there were twelve directors of the Bank, and the votes and opinions of these three, it is not to be presumed, could control those of the other nine. Preval says, that he did not take partin any measure calculated to get Gordon, Jun., out of the place of cashier. Bermudez did not: or, if he did, he does not disclose it; and Frey tells us, that he can give no reason why he should not be retained, and that he was astonished when he heard of the intended resignation. Of the opinions of Adams and Chinn, we have no doubt that the plaintiff was informed soon after he endorsed the notes.
The last allegation is, that the endorsements were’ obtained by the fraudulent practices and representations of the directors, and by conniving with Gordon, Jun., for the purpose of protecting him from what he considered a dangerous debt; by the assurance that the endorsements were to be nominal, and would be covered by the proceeds of the sales of property, which they knew could not be effected; and by the proffered assurances, that' Gordon should be retained in office. This allegation is, in truth, but a recapitulation of all the others.
That fraud may be proved by circumstances, and is more often established in that way, than by direct proof, is no doubt true ; simple presumptions, as well as legal ones, may be considered; but like every other allegation, they must be proved. Civ. Code, art. 1842. In this case, we have looked into the evidence in vain for sufficient proof of such fraud, as will annul the contract. Preval says, that he told the plaintiff all he knows of the transaction ; and that he knows of no fraud practised, for the purpose of obtaining his endorsements. Bermudez does not speak of any improper means or manoeuvres, to impose upon the plaintiff. Frey says, that he gave him all the information he possessed, and that he knows of no improper means used to entrap him. His *308 counsel has endeavored to prove that the plaintiff was entirely ignorant of everything that was going on. That he was not aware of any difficulty about the lost money, until the morning of the day he endorsed the notes ; that lie was then told, for the first time, that his name had been offered as security; that he was drawn into the Bank, and there, by outrageous practices and undue means, without any time being given for reflection or consultation, induced to sign his name. This is all a fancy sketch. The plaintiff knew of the deficit nearly three weeks before the date of the notes; he told Hiriart of it; and that M. Gordon, Sen., had applied to him to endorse the notes. No person asked him to go to the Bank ; he went of his own accord; and had the notes with him, signed by Gordon, Jun., and endorsed by Gordon, Sen. The committee appointed sometime before to examine into the causes of the default, had made their report; it was shown to him; and no director said anything, but Milligan, who was taken aside by, the plaintiff, but what conversation took place, is not stated. We can discover from the evidence very different inducements for the plaintiff to endorse the notes, and thus settle the deficit. He was cramped and harrassed for money, he had $85,000, of “ floating debt” pressing on him; he wanted to borrow $35,000, from the Bank. He knew well that, if he was sued on the bond of Gordon, Jun., as surety, he could not obtain the loan. He was the intimate personal friend of M. Gordon, Sen.; was his endorser for $40,000 ; and he (Gordon, Sen.,) was endorser for Gordon, Jun., for more than $25,000, on notes held by the Bank. If the credit of Gordon, Jun., was stopt in bank, the $25,000, would have to be paid up, or Gordon, Sen., must be protested, and his name thus rendered useless on the notes of the plaintiff to the amount of $48,000, and he would be held responsible for $40,000, as endorser on the notes of Gordon, Sen.
We come now to the resolution of the board of directors of the 9th of April, 1839, on which the plaintiff so much relies, to show that the Bank had no legal or just claim on Gordon, Juu. When we take into consideration the terms of this resolution, and the circumstances under which it was adopted, we do not think it is entitled to as much weight as is attempted to be given to it. From the testimony it is clear, that the directors, or many of them, *309 supposed that the money had been lost, from the negligence only of Gordon, Jun.: some may have suspected otherwise ; but they had not sufficient testimony to convince them. Frey says, that he did not believe that Gordon, Jun., had stolen or embezzled the money; he had too high an opinion of him, to believe that of him; but he thought he had been very negligent. jPreval and Bermudez both say, that there was not sufficient testimony to support a criminal prosecution for embezzlement; and that as there was not, they were botmd to presume the young man innocent. The resolution is, that the confidence of the board in the integrity and honor of Gordon, Jun., is unimpaired in consequence of what had occurred; and they acquit him of any suspicion calculated to affect his integrity. A very honest and correct man may, by negligence and inattention to the affairs of another, entrusted to his management, cause him great damage and loss, and yet not be dishonest; and if the employer or principal did not believe there was any immoral or dishouest motives, he might say so, and yet not acquit the party of negligence, or of his responsibility for it.
But we are satisfied, that the plaintiff was aware of the existence of this resolution, when he paid the notes. It is true, it was not published in the newspapers, until after the plaintiff had left for France, but it was publicly known, that Gordon, Jun., had resigned, and that such a resolution had been adopted. The relations that existed between the plaintiff, and Gordon, Sen., and Jun., were so intimate, that we can scarcely have a doubt that he knew of its existence.
The question upon which this case was remanded for a new trial, left open its whole merits; and the counsel on both sides have so argued it. It has been necessary to consider all the circumstances, both before and after the execution of the endorsements, to ascertain what knowledge the plaintiff had of the whole transaction, and at what time he acquired his information. A careful examination of the two records satisfies us, that when the plaintiff paid the notes, he had a knowledge of all the material facts appertaining to the transaction; and that, being so informed, he voluntarily executed the contract, by paying the notes. He says, he did not get all the information from Hiriart, *310 until fourteen months after his first conversation with him, which was on the last of February, or the first of March, 1839. The notes were paid on the 29th of April, 1840, just about fourteen months ; yet the plaintiff goes on to dispose of the note due, and those not due, as his own property. He gives no notice to the Bank that he had been defrauded. On the 18th of May, 1840, he writes a letter alluding again to the transaction, and makes no allusion to, or complaint of any thing improper, and nothing is heard of imposition and fraud, until July, 1842, although the plaintiff was still doing business with the Bank.
Time was applied for in this case, at the last term, by Rose-lius and Soule, counsel for the plaintiff, to prepare an argument on their application for a re-hearing.
In questions of this kind, we have much respect for the opinions of juries, but we cannot surrender to them our convictions, when called upon to revise their verdicts. If we had doubts, we should let the verdicts weigh much upon our minds; but, as we have none, we are bound to do our duty, and to decide according to the convictions the testimony has made on our minds.
It is, therefore, ordered and decreed, that the verdict of the jury be set aside, and the judgment annulled and reversed; and ours is for the defendants, with costs in both courts.